UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------X

UNITED STATES OF AMERICA,



USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1|14|10

**MEMORANDUM**

- v.-

S1 08 Cr. 1238 (NRB)

ANTHONY SEMINERIO,

Defendant.

---------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

"What the [expletive deleted] does it mean [to be an] elected official[]?" Former New York State Assemblyman Anthony Seminerio's pre-sentence hearing, held pursuant to <u>United States v. Fatico</u>, 579 F.2d 707 (2d Cir. 1978), (the "Hearing"), provided in-depth insight into Seminerio's answer to his own question: "It doesn't mean shit."[1] Gov. Ex. 3. The Hearing also provided insight into how incomplete Seminerio's answer was, for it exposed how Seminerio used his office to earn over a million dollars in "consulting fees."

On June 24, 2009, Seminerio pleaded guilty to one count of a Scheme to Defraud the Public of Honest Services under 18 U.S.C. § 1341 and § 1346. The government contends, as described in the Superseding Indictment, that Seminerio accepted bribes

---

[1] The Hearing spanned two and a half days: October 20, 21, and 30, 2009.

1

and engaged in extortion as part of a decade-long scheme to use his office -- both literally and figuratively -- for personal gain and at the expense of the public trust. Defendant maintains in his pre-sentence submissions that he is only accountable for a "single, isolated, criminal act" -- an "extremely aberrant and atypical episode" in which defendant failed to disclose a conflict of interest. Def's Mem. 146. The dichotomy between these two portraits necessitated the Fatico hearing.

Anthony Seminerio became a member of the New York State Assembly in 1978. During his career in the Assembly, he lobbied on behalf of entities that served his district in Queens, particularly for certain hospitals whose agenda he helped advance in Albany. In 1996, Seminerio began working as a consultant with Neighborhood Marketing Services ("Neighborhood Marketing"),[2] a company run by a local community leader named Arlene Pedone, whom Seminerio had known for many years. The business relationship between Pedone and Seminerio broke down in 1998, and Seminerio sought to continue earning money as a consultant on his own. He formed a sole proprietorship called

---

[2] Many members of the New York legislature earn additional income in connection with work performed outside their role as elected officials, for example as lawyers or consultants.

Marc Consultants and, over the next eight years, received over a million dollars of "consulting fees" through that entity.[3]

In a conversation with a former colleague in the Assembly, Brian McLaughlin, Seminerio explained that after many years of watching hospital executives get rich in part as a result of his efforts in Albany, he decided: "Screw you, from now on . . . I'm a consultant."[4]  Gov. Ex. 1.  Seminerio then described how he structured certain consulting arrangements in conjunction with a business partner, General Bernard Gordon Ehrlich (also a convicted felon): "We charge a consulting fee, he charges the consulting fee to the hospital, and I work for his consulting firm . . . It's perfect, it works out nice . . . And we don't have to do nothing . . . I mean I don't have to do nothing." Gov. Ex. 2.  Seminerio further predicted: "[T]he day I leave the Assembly . . . I'll lose maybe 60 percent of my business."  Gov. Ex. 1.

Seminerio asserts that he provided bona fide consulting services to his clients.  Although Seminerio's clients defined his value to them in terms of "opening doors" or "making introductions," Gov. Exs. 52, 56, several clients admit that Seminerio provided substantially the same services for them

---

[3] We note that there is a distinction between the total amount of fees that Seminerio received through Marc Consultants and the "loss amount" relevant for sentencing guidelines purposes.

[4] McLaughlin had himself pleaded guilty to corruption charges and, unbeknownst to Seminerio, was recording their conversations as part of McLaughlin's cooperation with the government.

3

before he became a paid consultant. Indeed, the record is devoid of any bona fide consulting services that fall outside the scope of activities an elected official could readily be expected to perform on behalf of his or her constituents. The entities that paid fees to Seminerio include a hospital, a college and a business lobbying organization, all of which serve the constituents of Seminerio's Assembly District. Not only were certain of defendant's services or introductions something that any diligent assemblyman might do as part of his role as a public servant, but in Seminerio's case, many of his so-called introductions were made between parties who already knew one another or to entities that were also paying for the privilege of Seminerio's influence and contacts.

Based upon defendant's plea and the conduct established by a preponderance of the evidence at the Hearing,[5] we conclude, for the reasons discussed below, that Section 2C1.1(b)(2) of the United States Sentencing Guidelines applies in this case. We further conclude, applying Section 2B1.1(b)(1) of the guidelines and based on our findings below, that the conduct established at

---

[5] See Fatico, 579 F.2d at 707 (discussing the appropriate standard for pre-sentence evidentiary hearings). Conduct for the purposes of sentencing need only be proved by a preponderance of the evidence to satisfy due process. United States v. Guerra, 888 F.2d 247, 251 (2d Cir. 1989). The rules of evidence, other than those involving privileges, do not apply in sentencing proceedings. Fed. R. Evid. 1101(d)(3). In this connection, certain evidentiary objections arose during the hearing, at which time we reserved judgment. Our rulings with respect to these outstanding objections are noted below.

the hearing supports a loss calculation of at least $1,000,000. Accordingly, the applicable advisory guidelines range, before any potential departures, is 135 to 168 months.

## DISCUSSION

To put our factual findings in context, we turn first to the scope of criminal liability for honest services fraud under 18 U.S.C. § 1346 and address defendant's argument that the statute is unconstitutionally vague. In Part II, we turn to the evidence presented at the Hearing and summarize our factual findings with respect to defendant's corrupt relationships relevant to the "loss amount" to be factored into his guidelines sentence under U.S.S.G. § 2B1.1(b)(1). In Part III, we address Seminerio's two remaining legal arguments, namely (a) that his sentencing guidelines range should not be determined under Section 2C1.1, but rather under the "Conflict of Interest" Section, 2C1.3, which would result in a lower guidelines range, and (b) that he was entitled to rely on an Advisory Opinion he obtained from the New York Legislative Ethics Committee and which permitted Seminerio to provide consulting services in certain circumstances.

## I. Scope of Criminal Liability for Honest Services Fraud

Section 1346 of Title 18 of the United States Code makes it a crime to devise a "a scheme or artifice to deprive another of the intangible right of honest services." The "important

5

factor" that must be proved is that a defendant "engaged in conduct 'for the purpose of executing a scheme to deprive another of the right of honest services.'" United States v. Middlemiss, 217 F.3d 112, 120 (2d Cir. 2000) (citing United States v. Sancho, 157 F.3d 918, 921 (2d Cir. 1998) (per curiam), cert. denied, 525 U.S. 1162 (1999)). In the Second Circuit, the scheme to deprive another of honest services need not implicate the defendant's official duties. Id.

The violation of a state statute or a duty imposed by state law can be used to establish federal criminal liability for honest services fraud, although a majority of Circuits do not require proof of a state law violation. See United States v. Weyhrauch, 548 F.3d 1237, 1244 (9th Cir. 2008), cert. granted, 129 S.Ct. 2863 (June 29, 2009) (collecting Circuit cases on this issue).[6] In the absence of specific Second Circuit authority on this issue, the District of Connecticut rejected the argument that a deprivation of honest services must be grounded in state law, noting Second Circuit cases that declined to impose restrictions on the source of the legal duty to provide honest services. United States v. Triumph Capital Group, 260 F. Supp. 2d 444, 461 (D. Conn. 2002). See Middlemiss, 217 F.3d at 120; Sancho, 157 F.3d at 920.

---

[6] The Supreme Court's grant of certiorari in Weyhrauch and two related honest services fraud cases is discussed further below.

6

Under this framework, the state law duties owed by a member of the New York State legislature inform part of the analysis of Seminerio's duty of honest services. New York Public Officers Law § 74(2) prohibits legislators from "hav[ing] any interest, financial or otherwise, direct or indirect, or engag[ing] in any business or transaction or professional activity or incur[ring] any obligation of any nature, which is in substantial conflict with the proper discharge of his duties in the public interest." New York Public Officers Law § 77 states:

> A member of the legislature . . . who asks or receives or consents or agrees to receive any emolument, gratuity or reward or any promise of emolument, gratuity or reward or any money, property or thing of value or of personal advantage, except such as may be authorized by law, for doing or omitting to do any official act, or for performing or omitting to perform any act whatsoever directly or indirectly related to any matter in respect to which any duty or discretion is by or in pursuance of law imposed upon or vested in him, or may be exercised by him by virtue of his office, or appointment or employment or his actual relation to the matter including, without limiting the generality of the foregoing, approving or promoting the passage of legislation or resolutions or the confirmation of appointees, or the conduct of investigations, . . . shall be guilty of a felony punishable by imprisonment for not more than ten years or by a fine of not more than five thousand dollars, or both.

Following from these state statutes, a legislator's intentional failure to disclose a conflict of interest or his acceptance of any payment in connection with his official duties, or acts

"indirectly related" to those duties, falls within the federal crime of honest services fraud under § 1346.

Beyond duties grounded in state law, courts have found that the honest services fraud statute prohibits the corrupt use of a public official's influence over matters outside the narrowest description of his formal duties or jurisdiction. The First Circuit has held that "the obligations [of § 1346] attach not only to formal official action like votes but also the informal exercise of influence on bills by a legislator, and that it prohibits influence-buying short of formal bribes." United States v. Urciuoli, 513 F.3d 290, 294 (2008) (internal citations omitted). This Court recently held that "the misuse of office (more broadly, misuse of position) for private gain is the line that separates run of the mill violations of state-law fiduciary duty . . . from federal crime." United States v. Kerik, 615 F. Supp. 2d 256, 265 (S.D.N.Y. 2009). In Kerik, the Court rejected the defendant's argument that § 1346 did not prohibit a public official from influencing independent agencies over which the defendant did not have official control:

    While the Court desires to cabin the breadth of
    section 1346 due to potential abuse of honest services
    fraud prosecutions, Kerik's position is inconsistent
    with binding case law in this circuit -- namely,
    Middlemiss -- and would create an imprudent precedent
    for public officeholders. Moreover, it is unlikely
    that Congress intended to permit an official to
    receive surreptitious payments and, in exchange, use
    his official status -- with all its access and

8

> influence -- to steer the direction of government business so long as that official did not abuse one of his official, enumerated duties.

Id. at 265-66.[7]  Seminerio's duty to render honest services to the public can be succinctly described as the "performance of his duties free from deceit, favoritism, bias, conflict of interest and self-enrichment." See Triumph Capital, 260 F. Supp. 2d at 459.

In his pre-sentencing submissions, Seminerio argues for the first time -- and in a somewhat cursory fashion -- that he did not have proper notice that the conduct alleged by the government was illegal, because 18 U.S.C. § 1346 is vague on its face and as applied. Def's Mem. 204-05; Def's Post-Hr'g Mem. 8. Insofar as Seminerio attacks the facial validity of § 1346, this argument has been rejected by the Second Circuit. United States v. Rybicki, 354 F.3d 124, 144 (2d Cir. 2003) (holding that § 1346 is not unconstitutionally vague on its face). We note that the Supreme Court has granted certiorari in three cases involving honest services fraud, each of which presents an argument by the petitioner that § 1346 is unconstitutionally vague. See Weyhrauch, 129 S.Ct. at 2863; Black v. United States, 129 S.Ct. 2379 (May 18, 2009); Skilling v. United

---

[7] While we share a concern, expressed by courts in this district and others, about the potential for abuse of honest services fraud prosecutions in certain circumstances, defendant's numerous corrupt relationships and breaches of the public trust established at the Hearing and outlined below, make it clear that this is not one of those cases.

States, 130 S.Ct. 393 (October 13, 2009).[8]    Nonetheless,
Seminerio's facial constitutional challenge is unavailing under
current Second Circuit law.

Seminerio's contention that § 1346 is unconstitutional as
applied to his case is also unavailing.    A statute is vague as
applied if it either fails to "give the person of ordinary
intelligence   a   reasonable   opportunity   to   know   what   is
prohibited, so that he may act accordingly" or fails to "provide
explicit standards for those who apply them."    Grayned v. City
of Rockford, 408 U.S. 104, 108 (1972).    Seminerio's conduct, as
described   in   Part   II,   violated   state   laws   that   prohibit
legislators from failing to disclose conflicts of interest and
from receiving payments for acts related directly or indirectly
to their official duties.    See New York Public Officers Law §§
74(2), 77.    An ordinary person could understand that (1) it was
wrong for a fiduciary, including a public official, to accept
such payments and to conceal such conflicts, and that (2)
Section 1346 prohibits schemes to do so.    See United States v.

---

[8] Aside from the issue of whether § 1346 is unconstitutionally vague on its
face, each of these cases is clearly distinguishable from that of Seminerio.
The defendants in Skilling and Black are private individuals, as opposed to
public or elected officials who owe duties to the public by virtue of their
office.    In Weyhrauch, the Supreme Court granted certiorari to address
"[w]hether, to convict a state official for depriving the public of its right
to the defendant's honest services through the non-disclosure of material
information, in violation of the mail-fraud statute (18 U.S.C. §§ 1341 and
1346), the government must prove that the defendant violated a disclosure
duty imposed by state law."    129 S.Ct. at 2863.    This issue is not presented
here, as Seminerio's conduct violated his duties as a legislator under the
New York Public Officers Law, as described below.

10

Bruno, slip op., 2009 WL 2601249 at *3 (N.D.N.Y. 2009) (denying motion to dismiss indictment).

In addition to being substantively unpersuasive, defendant's constitutional arguments are unpreserved. Seminerio entered into a valid, counseled and voluntary guilty plea, and failed to preserve any issues for appeal. "A defendant who pleads guilty unconditionally admits all elements of the formal charge and, in the absence of court-approved reservation of issues for appeal, waives all challenges to prosecution except those going to the court's jurisdiction." United States v. Lasaga, 328 F.3d 61, 63 (2d Cir. 2003). In Lasaga, the Second Circuit held that the defendant's guilty plea waived his right to challenge the constitutionality of a pornography law on Commerce Clause grounds. Similarly, Seminerio's post-plea constitutional challenge to § 1346 on vagueness grounds is not jurisdictional in nature, and therefore under the law of this Circuit and a number of others, he has waived this argument by pleading guilty. See United States v. Martinez-Martinez, 69 F.3d 1215, 1224 (1st Cir. 1995) (guilty plea waived right to challenge drug conspiracy statute as unconstitutionally vague), cert. denied, 517 U.S. 1115 (1996); United States v. Allen, 24 F.3d 1180, 1183 (10th Cir. 1994) ("[Defendant] contends that because the statutes are unconstitutionally vague when applied to his conduct as he characterizes it, the court had no

11

jurisdiction. However, [defendant] cannot prove this claim without contradicting the admissions in his guilty plea, namely that he committed the conduct alleged in the indictment *and* that in so doing he committed the crime charged."), cert. denied, 513 U.S. 992 (1994).

## II. **Findings of Fact**

We find by a preponderance of the credible evidence that Anthony Seminerio solicited and received payments from a number of organizations and used his elected office to lobby state legislators and agency officials on behalf of those paying clients. Neither defendant's 230-page Sentencing Memorandum, nor the evidence presented on his behalf at the Hearing, has squarely rebutted the substance of the government's evidence against him. Rather, defendant focused his factual arguments on just a few instances of potentially relevant conduct, particularly defendant's alleged extortion of Arlene Pedone and his alleged efforts to obtain a $25,000 grant for Jamaica Hospital as part of the 2001-2002 New York State Budget. With respect to the latter, the government no longer contends that Seminerio took any steps to obtain this particular grant and we do not consider this conduct or grant amount for the purposes of our loss calculation. Hr'g Tr. 370. Similarly, we do not

include any amount in our loss calculation that stems from defendant's alleged extortion of Arlene Pedone.[9]

We now review Seminerio's relevant offense conduct, specifically Seminerio's corrupt associations with several entities and his related activities involving state matters.

## a. Jamaica Hospital Medical Center

Jamaica Hospital Medical Center ("Jamaica Hospital") is a hospital in Queens, New York, and one of three hospitals that together comprise the Medisys Health Network ("Medisys"). David Rosen is the CEO of Jamaica Hospital and of Medisys. Both entities are largely dependent on Medicaid reimbursements at rates set by the New York State Legislature each year. Between April 2000 and March 2008, Jamaica Hospital paid Anthony Seminerio, through Marc Consultants, approximately $310,000.

In the mid-1980s, Seminerio played a large role in the Assembly's passage of the Secured Hospital Financing Program, through which Medisys obtained $105 million in state financing.

---

[9] An issue arose at the Hearing regarding the admissibility of an affidavit that defense counsel offered into evidence for the purpose of attacking Pedone's credibility and proposing an alternative version of the breakdown of Seminerio's relationship with Pedone. Hr'g Tr. 314-24. Since we are not including any amount related to this situation in our loss calculation, we need not resolve this evidentiary issue, as it is now moot. However, even if Pedone's conduct were relevant to our calculation, we would not permit the use of such an affidavit, nor the use of the live testimony that defense counsel offered to provide in their letter to the Court, dated November 5, 2009. We see no reason to permit extrinsic evidence to be used to attack the credibility of a live witness whom defense counsel had ample opportunity to cross examine at the Hearing -- and whom defense counsel does not propose to recall and cross-examine. To the extent that defense counsel characterizes the affidavit as containing new evidence that was not available at the time of Pedone's testimony, we reject this argument. Clearly, the facts alleged in this affidavit, if true, would have been known to the defendant himself.

13

As Seminerio suggested to FBI informant Brian McLaughlin, after watching hospital executives "making thousands" as a result of his "favors," Seminerio decided: "Screw you, from now on, you know, I'm a consultant." Gov. Ex. 1.

The nature of Seminerio's relationship with Jamaica Hospital is revealed in several intercepted phone calls between Seminerio and Rosen in which they discuss New York State matters such as the annual Medicaid budget and Seminerio offers to talk to a state executive official on Rosen's behalf. Gov. Exs. 4, 5. During these same calls, Seminerio asked Rosen for money he was owed under their arrangement, Gov. Ex. 4, 5, and sought to impress upon Rosen the value of Seminerio's political connections in Albany, including his relationship with the former Senate Majority Leader Joseph Bruno:[10]

> "Let me tell you something, you know, and I can tell it to you . . . I walk into Bruno's office like I walk into your office . . . And I talk to Bruno like I talk to you . . . So that, that kind of relationship you can't buy for a million dollars."

Gov. Ex. 5.

### i. Seminerio Sponsored Legislation in 2006 to Provide Financing for Jamaica Hospital

In June 2006, Jamaica Hospital lobbied for a bill in the New York State Legislature that sought to reduce "debt services costs" for several eligible hospitals. Gov. Ex. 461. Defense

---

[10] On December 7, 2009, Bruno was convicted of two counts of honest services fraud under 18 U.S.C. § 1346, following a jury trial in the United States District Court for the Northern District of New York.

counsel conceded at the Hearing that the benefits of this bill to Jamaica Hospital were well known to the defendant. Hr'g Tr. 372. Seminerio was one of five co-sponsors of the Assembly's version of the bill. Gov. Ex. 462.

The defendant argued in his Sentencing Memorandum and at the Hearing that his sponsorship of this legislation was permissible because (a) he was not the lead sponsor of the bill, and (b) the bill would have benefited other institutions as well as Jamaica Hospital. Def's. Mem. 218; Hr'g Tr. 371. This argument is wholly unpersuasive because it misstates the line between the legitimate work of a legislator and criminally corrupt conduct. The law cannot be read so technically that an elected official may receive payments from an entity and then sponsor legislation benefiting that "client," so long as the official simply refrains from becoming the lead sponsor of the bill. In fact, something far less formal than lead sponsorship of an Assembly bill can result in criminal liability. See Kerik, 615 F. Supp. 2d at 266. As for the suggestion that Seminerio may defend himself against bribery charges by showing that the proposed legislation would have benefited multiple entities, such a rule would similarly undermine the substance of our anticorruption laws and ignore the reality of the legislative process, which requires compromise, consensus, and

15

intended benefit to more than one entity or group. Hr'g Tr. 378.

### ii. Seminerio Assisted Medisys in Obtaining $19 Million in Loan Forgiveness in 2006

On June 26, 2000, Medisys assumed management of Brookdale Hospital at the request of several state agencies, union leaders, and elected officials. Brookdale Hospital had fallen severely into debt and Jamaica Hospital lobbied the New York State legislature to provide $19 million in loan forgiveness to Brookdale, which was Jamaica Hospital's sister entity within the Medisys network. Seminerio assisted Jamaica Hospital with this effort and arranged for Rosen to meet the Chief of Staff to former New York Governor George Pataki. Gov. Exs. 452-53. While we do not include the $19 million obtained by Medisys in our loss calculation, Seminerio's involvement in this effort further establishes his involvement in state legislative matters on behalf of the Medisys hospitals.

### iii. Seminerio Supported Jamaica Hospital's Drive for Discretionary Funding from the New York State Assembly in April 2008

In April 2008, internal Jamaica Hospital documents, describing Jamaica Hospital's "discretionary funding agenda" in the New York State Assembly, suggest that such funding was "supported by Seminerio," although "spearhead[ed]" by another member of the Assembly. Gov. Ex. 741. This evidence

16

corroborates the corrupt nature of the relationship between Jamaica Hospital and Assemblyman Seminerio: having provided the defendant with a reliable source of income for many years, the hospital had a reliable ally in Albany.

### iv. **Seminerio Lobbied a New York State Executive Office on behalf of Jamaica Hospital's Efforts to Acquire New Hospitals**

In or about July 2008, two financially struggling hospitals in Queens (collectively, the "Target Hospitals") were up for sale. The Target Hospitals had recently sought emergency funding from New York State and therefore it was understood that the New York State Department of Health would have considerable sway in structuring a deal to acquire them. Jamaica Hospital was bidding for these entities, and Anthony Seminerio lobbied a New York State healthcare official, Dennis Whalen, in support of these acquisition efforts. In an intercepted phone call on July 10, 2008, defendant spoke to Whalen in glowing terms about Jamaica Hospital while disparaging the competing acquirer, Parkway Hospital.[11] Gov. Ex. 7. Seminerio stated plainly that with regard to this acquisition, "[he]'d rather see Jamaica

---

[11] Seminerio told Whalen: "I hate, hate Parkway Hospital." Gov. Ex. 7. He also made comments apparently in reference to Robert Aquino, the CEO of Parkway: "This guy never went for 10 cents of his own money . . . This guy never went for three cents out of his own pocket." Id. These remarks can be explained by additional evidence that Seminerio attempted to extort Aquino into entering a consulting agreement in 2004 and 2005. Gov. Ex. 50. Although we do not calculate a loss estimate reflecting this alleged extortion attempt, we find sufficient evidence that Aquino refused to become Seminerio's client, which provides further context to Seminerio's disparaging comments regarding Parkway during his call with Whalen.

Hospital get it," and at the end of the call Whalen indicated his agreement. Id. At no point in this call, or in any other conversation with Whalen, did Seminerio disclose that he was a paid consultant of Jamaica Hospital.

Defendant does not contest these facts and has admitted in his plea allocution and presentencing memoranda that the failure to disclose his conflict of interest on this occasion constituted honest services fraud. However, defendant does not offer a distinction between this incident and his numerous other undisclosed conflicts when acting on behalf of Jamaica Hospital and other clients. Moreover, Seminerio's conversation with Whalen establishes conduct that went beyond mere nondisclosure of a conflicting interest: Seminerio was actively using the influence of his office in an attempt to benefit his paying client -- and himself. Indeed, the day before this call, Rosen spoke to Seminerio about the fact that Whalen had "not been such a great friend" to Jamaica Hospital. Gov. Ex. 6. Seminerio replied: "[Y]ou gotta tell me these things . . . Now when I break his balls, I know what to break his balls about." Id. The intercepted phone calls also show that only minutes after the conversation with Whalen, Seminerio called Rosen to report back on what had happened. Gov. Ex. 8.

18

### v. Seminerio Advocated on Behalf of Jamaica Hospital's Interests in August 2008 Budget Deliberations

Seminerio's actions in connection with Governor David Paterson's proposed healthcare budget cuts in August 2008 are further evidence of defendant's involvement in state matters on behalf of Jamaica Hospital. On August 11, 2008, Seminerio spoke to the Speaker of the Assembly, Sheldon Silver, to express his view that funding health care was more important than funding education: "[P]eople's education, my ass . . . You walking the street a cripple and you're not being treated, go tell me about your education." Gov. Ex. 9. Seminerio then called Rosen to relay what Seminerio regarded as inside news from Silver that there would not be any cuts affecting Jamaica Hospital. Gov. Ex. 10.

The following day, Seminerio spoke to Jamaica Hospital's outside counsel in preparing for an emergency meeting of Assembly Democrats to discuss budget cuts. Gov. Ex. 12. On this call, the lawyer coached Seminerio on "introducing the concept that safety-net hospitals . . . cannot endure any further cuts." Id. Seminerio reassured the lawyer by describing his conversations with Speaker Silver: "And I told him, 'Shelley, I don't give a [expletive deleted] ya close every hospital in the city. You leave my hospitals alone.'" Gov. Ex. 12.

19

## b. **Neighborhood Health Providers**

Neighborhood Health Providers ("NHP") is a healthcare maintenance organization ("HMO") that provides Medicaid health insurance to its enrollees. NHP was set up within the Medisys hospital network in the mid-1990s and was owned in part by Jamaica Hospital. Hr'g Tr. 67-68. Seminerio's relationship with NHP began when he was working with Arlene Pedone's consulting company, which had been hired to assist NHP with enrolling members of the community in Medicaid.[12] Hr'g Tr. 17, 49-53. Following the termination of Seminerio's business dealings with Pedone, NHP continued to pay Seminerio through Marc Consultants.[13] In total NHP paid approximately $80,834 to Seminerio through his firm, in monthly installments continuing for almost a decade. When Stephen Bory, CEO of NHP, was asked at the Hearing what "consulting" services Seminerio provided to NHP to earn his fees, Bory could recall only the following: (1) Seminerio once provided NHP with a "list of contacts" to help with marketing; (2) Seminerio set up a meeting between Bory and the CEO of Elmhurst Hospital (with whom NHP already had a contractual relationship); (3) Seminerio introduced Bory to

---

[12] Seminerio's conduct during that period is not relevant to our loss calculation.

[13] Stephen Bory, CEO of NHP, testified at the Hearing that he contracted with Seminerio's consulting firm in November 1998 at the direction of David Rosen. Hr'g Tr. 74-75. Rosen was effectively Bory's boss because of his position as CEO of Medisys, which owned NHP at that time. Id. Bory also testified that he was following the directions of the lawyer who served as Jamaica Hospital's outside counsel and who attended the meeting at which NHP retained Seminerio. Id. at 77-78.

20

another hospital executive at either a fundraiser or a holiday party.[14]  Hr'g Tr. 82-84.  The disparity between these isolated acts and the scope of payments made to Seminerio, both in amount and length of time, supports the government's allegation that this relationship was another means by which the Assemblyman received payments from Medisys for his political favor and influence in Albany.  Furthermore, confronted with Bory's sworn testimony as to the paucity of services Seminerio actually provided, the defense could not muster additional evidence of other bona fide services provided by Seminerio to NHP or otherwise challenge the substance of Bory's testimony.

### c. Jamaica Chamber of Commerce

The Jamaica Chamber of Commerce ("JCC") is a membership-based organization involved in economic development in Queens, New York.  The JCC receives a large part of its funding from monies allocated by the New York State Legislature.  The President of the JCC, Robert Richards, lobbies the State legislature and used to visit Seminerio's legislative office in

---

[14] Bory's testimony also mentioned that Serminerio introduced NHP to Tricare, an entity controlled by General Bernard Ehrlich.  However, this introduction cannot properly be considered among Seminerio's potentially bona fide consulting services because Seminerio received a percentage of the revenues resulting from Tricare referrals and his efforts to persuade hospitals to do business with Tricare might well be considered within the ambit of honest services fraud.  In any event, the introduction did not lead to any business for NHP since NHP is not licensed to do commercial health insurance. Hr'g Tr. 85.

21

Albany almost every day that the Assembly was in session.[15] At the Hearing, Richards testified that Seminerio asked him to become a consulting client in the summer of 1999. Hr'g Tr. 131. It is undisputed that Richards began to pay Seminerio $700 per month from 2000 to 2002, totaling $21,000. However, the defense has not adduced any evidence of legitimate consulting services performed by Seminerio for the JCC. These facts alone are sufficient to include the $21,000 in our loss calculation.

What is more, Richards also testified that Seminerio extorted these payments from him by threatening to block legislation that Richards proposed if Richards would not enter a consulting agreement with the Assemblyman. Such threats would be consistent with the allegations of Robert Aquino, the CEO of Parkway Hospital, that Seminerio similarly attempted to extort him into a consulting arrangement in 2004 and 2005. According to Aquino's statements to the FBI, Seminerio asked Aquino if he knew how miserable Seminerio could make Aquino's life. Gov. Ex. 50. While we do not include a loss amount for the alleged extortion of Parkway Hospital, the similarity between the testimony of Aquino and that of Richards -- two independent

---

[15] At the Hearing, defense counsel sought to enter exhibits DD-27 and UU as evidence to impeach the credibility of Richards' testimony. To the extent our ruling from the bench needs clarification, we hereby sustain the government's objection to these exhibits, which are irrelevant and which relate to collateral issues that defense counsel failed to raise during cross-examination of Richards. See Hr'g Tr. 401-402.

witnesses who are unacquainted -- supports the credibility of each with respect to defendant's extortion attempts.[16]

The defense contested Richards' allegations of extortion by presenting evidence that Seminerio and Richards maintained a close friendship during and after the period when the allegedly extortionate payments were being made. We need not resolve this dispute to conclude that Seminerio's guidelines calculation should reflect these payments from Richards. Whether Seminerio accepted payments from Richards for using his office to advocate on the JCC's behalf (i.e., bribery) or to refrain from using his office to harm the JCC's interests (i.e., extortion), the relationship and accompanying payments are part of Seminerio's scheme to deprive the public of his honest services.

### d. **Winston Financial**

Winston Financial provides insurance brokerage services to hospitals. Winston Financial paid Seminerio 25 percent of the fees that it earned from its contracts with two hospitals, Jamaica Hospital and Wyckoff Heights Medical Center ("Wyckoff Heights"). Seminerio used his office and influence as an Assemblyman to urge those hospitals to retain Winston Financial

---

[16] An issue arose at the Hearing regarding the admissibility of three documents that defense counsel offered into evidence for the purpose of attacking Aquino's credibility -- purportedly by providing a motive for Aquino to falsify his statements to the FBI. Hr'g Tr. 397-98. We hereby receive defense Exhibits DD-17, DD-18 and OO into evidence. However, when weighed against all the evidence, especially Seminerio's own statement that Aquino "never went for three cents out of his own pocket," we find Aquino's account of the alleged extortion to be credible. Gov. Ex. 7.

23

and ultimately to protect the income he derived from those contracts.[17]   Winston Financial paid Seminerio approximately \$176,512, through Marc Consultants, between April 2000 and March 2008, even though there is no suggestion -- let alone evidence - - that Seminerio had any expertise in the insurance field. Since Seminerio's fees represented one fourth of the value of the fees Winston Financial derived from the hospital contracts Seminerio facilitated, the proper amount to be included in the loss calculation is four times the amount Seminerio was paid, or \$706,048.   This amount represents the "value . . . obtained . . . by others acting with a public official," here Winston Financial, in connection with the honest services fraud. U.S.S.G. § 2C1.1(b)(2).

### i. Seminerio Used His Office and Influence To Ensure That Wyckoff Heights Continued To Be Winston Financial's Client

As noted above, Seminerio provided no bona fide consulting services to Winston Financial and had no expertise whatsoever in

---

[17] This aspect of defendant's scheme is seemingly more complicated than other relationships because Seminerio took action with respect to state officials and matters not on behalf of the entity that paid him, Winston Financial, but on behalf of Winston Financial's clients, Wyckoff Heights and Jamaica Hospital.  Notably, Seminerio had similar arrangements with several entities controlled by General Bernard Ehrlich, an associate of Seminerio's who had previously been convicted of federal bribery and extortion charges. Seminerio's role was to persuade state-funded hospitals to retain Ehrlich's services, for which he was paid a percentage of the resulting contract. Discussing these deals with Brian McLaughlin, Seminerio explained, "We charge a consulting fee, [Ehrlich] charges the consulting fee to the hospital, and I work for his consulting firm . . . It's perfect, it works out nice . . . And we don't have to do nothing . . . I mean I don't have to do nothing . . . [A]t least the last six times they accepted the package." Gov. Ex. 2.

24

insurance brokerage. Rather, Seminerio's role was to ensure that Winston Financial got paid by Jamaica Hospital and Wyckoff Heights and to use his influence over these hospitals to prevent Winston Financial from losing its contracts with them. For example, in 2004, Wyckoff Heights hired a new executive who raised concerns about deficiencies in Winston Financial's services. Seminerio called this executive's cell phone, identifying himself as "Assemblyman Seminerio," and asked "What the [expletive deleted] is the problem with Winston?" Gov. Ex. 54. When the Wyckoff executive told Seminerio that he would look into the situation, Seminerio told him unequivocally to "fix it." Id.

After this incident, Winston Financial did indeed maintain their contract with Wyckoff Heights, until 2007, when the hospital ran into financial difficulties and brought on a Chief Restructuring Officer (the "CRO") at the direction of the New York State Department of Health. The CRO made it known that he favored replacing Winston Financial with a different brokerage firm (a Tennessee-based firm called The Hanback Group). When the CEO of Winston Financial, Robert Bradley, learned of this, he sent an email to an associate of Seminerio's asking what was going on, why the Tennessee firm was being considered, and "[d]o we need Tony's involvement in this from an Albany perspective?" Gov. Ex. 731. In a follow-up email minutes later, Bradley

25

wrote: "I don't expect with the investment of time and energy Winston has spent over the years building political relationship [sic] in New York, I do not expect to lose New York business, in which we done a superb, loyal job, to some hokeys from TN . . ." Id. Insofar as Bradley viewed Seminerio as willing and able to apply political pressure on Wyckoff Heights to protect their contract, Seminerio's conduct confirmed that perception. At Bradley's request, Seminerio contacted a New York State healthcare official, Dennis Whalen, to set up a meeting between Whalen and the current CEO of Wyckoff Heights. Gov. Exs. 13-17. The phone calls make clear that the purpose of Seminerio's intervention was to preserve the job of the current Wyckoff Heights CEO, who was a friend of Seminerio's and had helped to protect the Winston Financial contract for many years.

In May 2008, Seminerio asked a salesperson at Winston Financial about a check he was expecting: "What is happening with Wyckoff? Do I have a check coming?" Gov. Ex. 19. When the Winston Financial salesperson said that Wyckoff Heights were having financial difficulties and were not paying their bills, Seminerio replied, "[w]e [i.e., the State legislature] just got them some money to keep them alive." Id. This conversation illustrates the interconnection between Seminerio's work in the Assembly, which yields considerable influence over hospital budgets, and the personal benefit Seminerio derived from the

26

financial health of particular hospitals -- "[his] hospitals" -- which contracted with Winston Financial and ultimately generated sizable percentage payments to Seminerio.

### ii. **Seminerio Guaranteed that Jamaica Hospital Would Continue To Be Winston Financial's Client**

Seminerio played a similar role in Jamaica Hospital's dealings with Winston Financial. In February 2008, Seminerio left a message for David Rosen thanking him for his help retaining Winston Financial's services and conveying to Rosen the importance of the Winston-Jamaica contract to Seminerio's personal finances: "This will be my annuity when I retire." Gov. Ex. 751. When viewed in conjunction with the other acts Seminerio took on behalf of Jamaica Hospital on state matters and the payments he received from that hospital, it appears that maintaining the contract with Winston Financial was another way for Jamaica Hospital to curry the Assemblyman's political favor.

In early 2008, Seminerio grew frustrated with the way Winston Financial was structuring the payments from the Jamaica Hospital contract. Seminerio's business associate had been receiving part of the proceeds from that deal, but Winston Financial began to make payments to the business associate in lieu of Seminerio. On February 22, 2008, Seminerio called a salesperson at Winston Financial and complained, "[e]verybody made [expletive deleted] money but me on that Jamaica Hospital

27

thing." Gov. Ex. 22. On a separate call with Robert Bradley, Seminerio reiterated what he perceived as his ability to maintain and protect Winston Financial's relationship with Jamaica Hospital: "Jamaica Hospital and those you'll always have, as long as I'm alive . . . Jamaica Hospital is Tony Seminerio's piece. Nobody'll touch that thing." Gov. Ex. 21. Seminerio viewed his value, for which he was compensated, as his ability to influence, and indeed to pressure, Jamaica Hospital to remain a client of Winston Financial.

#### e. Plaza College

Plaza College is a college in Queens, New York. Charles Callahan III, the Vice President and Provost of Plaza College, is also the CEO and sole employee of Collegiate Management Associates ("CMA"), a consulting agency whose only clients are Plaza College and members of the Callahan family (who themselves are part-owners of the College). Gov. Ex. 52. CMA paid Seminerio $170,350, through Marc Consultants, between June 1999 and September 2007.

While receiving these payments from Callahan/CMA, Seminerio used his role in the Assembly to benefit Plaza College.[18] In

---

[18] We note that Seminerio also used his influence to advocate for Callahan's appointment to various New York State positions, including membership on the New York State Board of Regents, the New York Workforce Investment Board, and the New York State Work Force Investment Act Government Board. For the latter position, Seminerio formally nominated Callahan in a letter to former Governor George Pataki dated August 23, 1999. Gov. Ex. 801.

28

particular, Seminerio advanced a piece of legislation, known as the "Candidacy Bill," which was of particular value to Plaza College. This bill effectively increased the barriers to entry for competitors of Plaza College by introducing a three-year "review period" before colleges could begin to confer Associate Degrees, the type of degree Plaza College was already authorized to confer.

Although Callahan had hired a lobbyist to push for the Candidacy Bill as far back as 1997, Gov. Exs. 802-03, CMA also entered into a consulting agreement with Marc Consultants effective June 15, 1999. Gov. Ex. 75A. On August 5, 1999, after being retained by CMA, Seminerio wrote to the Deputy Commissioner of the New York State Education Department emphasizing his sponsorship of the Candidacy Bill:

As a member of the Higher Education Committee of the New York State Assembly I am concerned . . . that your office has been inundated with requests for degree-granting powers by a variety of schools . . .   As you are aware, I am the Assembly sponsor of a candidacy bill that is designed to protect the students of New York State . . .

Gov. Ex. 804. In his letter, Seminerio went on to request a list of all entities applying for such degree-granting powers.

Seminerio introduced a version of the Candidacy Bill to the Assembly in 1996, 1997, 1999, 2001, 2003, 2006, 2007 and 2009. Def. Exs. B1-B13. Defendant argues that his actions were permissible because he sponsored this bill both before and after

29

the period in which Seminerio was paid as a consultant by CMA.
Hr'g Tr. 406.   We reject this argument.   Seminerio may have
supported this bill in part because he genuinely felt it
benefited his constituents, but this plainly does not permit him
to accept payments from an entity with a vested interest in
legislation he continued to sponsor.   Criminal liability for
accepting bribes does not require but-for causation.   See United
States v. Panarella, 277 F.3d 678, 680 (3d Cir. 2002) ("[W]e
hold that where a public official conceals a financial interest
in violation of state criminal law and takes discretionary
action in his official capacity that the official knows will
directly benefit the concealed interest, the official has
deprived the public of his honest services, regardless whether
the concealed financial interest improperly influenced the
official's actions."); United States v. Espy, 989 F. Supp. 17,
26 (D.D.C. 1997), rev'd in part on other grounds, 145 F.3d 1369
(D.C. Cir. 1998) (finding allegations of quid pro quo or selling
of one's office unnecessary to support charges of honest
services fraud).

Callahan told the FBI that prior to paying Seminerio
through CMA, Seminerio essentially did the same things for
Callahan, only on a less frequent basis. Gov. Ex. 52.   Callahan
apparently paid the Assemblyman because he did not want to "wear
out his welcome."   Id.   This characterization of their

30

relationship echoes Seminerio's own recorded statement to Brian McLaughlin that after years of seeing others profit from his assistance as an Assemblyman, Seminerio decided "Screw you, from now on . . . I'm a consultant." Gov. Ex. 1. In other words, Seminerio was not satisfied with being paid his legislator's salary for lobbying, making introductions, and otherwise using his influence as an assemblyman; as a "consultant" he received a bigger piece of the "action" he felt he had been missing in those prior years.

### f. Long Island Rail Road

Seminerio's corrupt relationship with the Long Island Rail Road ("LIRR") was distinct because the LIRR was never a client of Seminerio or of Marc Consultants. Nevertheless, by his own account Seminerio used his position as an Assemblyman to secure jobs for friends at the LIRR in exchange for his securing state funds for the railroad:

> You know how many people I got jobs in the Rail Road? Any time that I would, uh, give them a two-hundred-fifty thousand contribution, or five-hundred thousand, for repairs on the rail in there, I need two jobs. Even if I didn't have anybody, then I find two people and get them jobs . . . I always did tell them, . . . "your human resources person takes care of their own. I need two jobs, you got two jobs." You know. "We got two jobs for me, you got five-hundred thousand."

Gov. Ex. 3 (statement to Brian McLaughlin). Seminerio's own description of this arrangement is corroborated by other credible evidence. In April 2007, Seminerio obtained $250,000

in State funding for the LIRR through a discretionary member item in connection with a painting project. Gov. Ex. 1001. In February 2008, Seminerio's son asked the Assemblyman to help out a friend who was applying for a job at the LIRR. Gov. Ex. 32. Seminerio called an LIRR employee, identified himself as Assemblyman Anthony Seminerio, and talked about a "dear friend of the family" who was applying for a job as a machinist at the LIRR. Gov. Ex. 33. Seminerio then said:

[N]ow do me a favor . . . At your leisure, if you guys have got a proj-, cause usually in the old days when you've had projects I've funded them for you guys . . . So if you got something going, I'd be more than glad to meet with you over a cup of coffee or anything.

Id. Later that day, Seminerio met with the family friend who was seeking a job at the LIRR and explained: "What will probably happen, they'll come up with a project and I'll fund it for 'em and you should get the job." Gov. Ex. 34.

Thus, the evidence shows that defendant sought at least one job at the LIRR in return for securing at least $250,000 in state funding for the railroad. We therefore include the amount of that funding, $250,000, in our loss calculation.

### g. Schemes Involving an FBI Undercover

From January, 2008, until September, 2008, an FBI agent working in an undercover capacity (the "Undercover") retained Seminerio's consulting firm, Marc Consultants, and paid

32

Seminerio a total of $25,000. Seminerio first assisted the Undercover with a plan to invest in probation services, which would have required New York State legislation to privatize probation supervision. When Seminerio initially confirmed that this would require legislation, he stated that he could not work as a consultant on State matters and offered to put the Undercover in touch with a lobbyist. Gov. Ex. 35.

However, as in other contexts, any initial ethical concerns Seminerio may have had regarding State involvement with the Undercover's proposal soon vanished. During the period in which the Undercover gave Seminerio monthly checks, Seminerio set up a meeting between the Undercover and Assemblyman Jeffrion Aubry, the Chair of the Assembly Corrections Committee, Gov. Exs. 36-37, and Seminerio himself attended the meeting with the Undercover and Assemblyman Aubry at an Albany restaurant on April 15, 2008 -- where the three discussed legislation that would privatize probation services in New York State. What is more, Seminerio did not disclose to Aubry that the Undercover was a paying consulting client. The connection between Seminerio's facilitating the meeting and receiving the Undercover's monthly payments was abundantly clear since, the day before this meeting, Seminerio asked the Undercover when he would be paid, noting that he had not received "anything for March, and April's almost gone." Gov. Ex. 36. When the

33

Undercover offered to bring a check to Seminerio's office, Seminerio said: "[Y]ou can't give me the check in the building. It's against protocol. It has to be in the restaurant." Gov. Ex. 37. The Undercover eventually gave Seminerio a check for $5,000 at the restaurant after Assemblyman Aubry had left. Seminerio remarked that the check was "none of [Aubry's] business." Gov. Ex. 38.

Seminerio assisted the Undercover with a second proposed project involving redevelopment of certain environmentally contaminated sites known as "brownfields." A New York State program provides government assistance for cleaning up and developing such sites. On June 10, 2008, Seminerio set up a meeting between the Undercover and Assemblyman Vito Lopez, Chair of the Assembly Housing Committee. Lopez met the Undercover in his legislative office in Albany. While Seminerio did not attend that meeting, he brought the Undercover to the Assembly a week later and had a folding chair set up for his guest on the floor of the Assembly Chamber. Seminerio also introduced the Undercover to the Chair of the Assembly Environmental Conservation Committee and the two discussed brownfield redevelopment. That same day, Seminerio took the Undercover to the Chamber of the State Senate and introduced him to the Chair of the Senate Environmental Conservation Committee. The two discussed brownfield redevelopment and agreed to meet at a later

date. At no point did Seminerio disclose to these other legislators that the Undercover was a paying consulting client.

## III. Defendant's Additional Legal Arguments

As noted above, while defendant failed to rebut the facts described in Part II, which we find were established by a preponderance of the evidence, he does advance certain legal arguments which relate to his guidelines calculation and the scope of conduct for which he may be held accountable at sentencing. These arguments, however, are ultimately unpersuasive.

### a. The Applicable Sentencing Guidelines

Section 2C1.1 of the Sentencing Guidelines is the applicable provision for the crime of mail fraud under 18 U.S.C. § 1341, which, pursuant to 18 U.S.C. § 1346, includes "a scheme or artifice to deprive another of the intangible right of honest services." Seminerio argues that his sentencing guidelines range should be determined not under Section 2C1.1 but under the "Conflict of Interest" Section, 2C1.3, which requires no loss calculation and, accordingly, would result in a far lower advisory guidelines range. We reject defendant's argument for two reasons. First, the Commentary to Section 2C1.1, which lists the statutory provisions to which that section applies, includes 18 U.S.C. § 1341 "if the scheme or artifice to defraud was to deprive another of the intangible right of honest

services of a public official."[19] The Commentary to Section 2C1.3 makes no such reference to § 1341. This contrast makes it clear that the Sentencing Commission intended Section 2C1.1 to apply to the crime to which Seminerio pleaded guilty.

Second, Section 2C1.3 contains a cross reference to 2C1.1 "if the offense involved a bribe or gratuity." As discussed above, the defendant's criminal conduct was far broader than mere nondisclosure of a conflict of interest: Seminerio used his office to act on behalf of clients who were paying him for that privilege. Accepting such payments fits squarely within the ambit of Section 2C1.1. See United States v. Jennings, 487 F.3d 564, 587-88 (8th Cir. 2007) (holding that Section 2C1.1 is the appropriate provision where defendants have an undisclosed conflict of interest and also use their official positions to "lobby for their personal interest and to influence their colleagues").[20]

## b. Reliance on the Legislative Ethics Opinion

Seminerio's remaining legal argument is that, with the exception of a single incident (the July 10, 2008 telephone call with Whalen during which defendant admittedly failed to disclose

---

[19] The Statutory Index to the Guidelines Manual also lists Section 2C1.1 as the applicable provision for a violation of 18 U.S.C. § 1341.
[20] Because we find that defendant's conduct involved the acceptance of bribes or gratuities, we need not address defendant's arguments regarding the applicability of Section 2C1.3 to honest services fraud involving only an undisclosed conflict of interest, nor his discussion of United States v. Hasner, 340 F.3d 1261, 1267 (11th Cir. 2003). See Def's. Mem. 151-57.

his conflict of interest), he is shielded from criminal liability because in conducting his "consulting" activities, he was relying on an Advisory Opinion issued to him by the New York Legislative Ethics Committee in 1996. Def. Ex. L; Def's Mem. 137-139; Def's Post-Hr'g Mem. 5-8. Advisory Opinion 96-06 concludes, inter alia, that "as long as the services rendered by [Seminerio] do not involve matters before a New York State agency, he may be compensated to identify and access grant applications which are directed to federal, city or private entities." Def. Ex. L. However, Seminerio's failure to provide full disclosure of material facts to the committee that rendered this opinion -- and his failure to comply with the opinion itself once it was issued -- make his arguments ultimately unavailing.

As noted above, Seminerio began working as a consultant with Arlene Pedone's Neighborhood Marketing Services. Seminerio's work with Neighborhood Marketing Services related specifically to a single client, NHP, which is an HMO that provides health insurance through Medicaid. On March 20, 1996, Seminerio wrote a letter to the Counsel to the Assembly Majority Leader which stated that (1) Seminerio planned to work as a consultant for a marketing firm, (2) one of the firm's clients was an HMO, and (3) "if any legislation concerning HMOs came before the Assembly, [Seminerio] could not vote on that

legislation." Def. Ex. EE. Seminerio did not disclose that the HMO client was an entity that exclusively provided services to Medicaid recipients. This omission was material because such an entity stood to benefit from votes that Seminerio made as a legislator on the scope and amount of Medicaid reimbursement.

In April and May of 1996, Seminerio wrote to the co-chairs of the Legislative Ethics Committee. Def. Exs. FF, GG. These letters disclosed Seminerio's consulting position and the existence of an HMO client, but did not suggest that Seminerio would refrain from voting on legislation concerning HMOs (in contrast to his earlier letter to the Assembly Counsel).[21] More importantly, Seminerio once again did not disclose that the HMO client was a Medicaid-funded entity. Seminerio wrote that he had "discussed the matter with Assembly Counsel . . . [and] [i]n his opinion, no conflict was presented." Id. In response to these letters, the Legislative Ethics Committee issued Advisory Opinion 96-06, which stated that Seminerio was allowed to work as a consultant, but could not provide consulting services in connection with any New York State matter. Def. Ex. L.

On January 9, 2001, a few years after Seminerio formed Marc Consultants, he wrote to another assemblyman and member of the Ethics and Guidance Committee, stating that he had terminated

---

[21] There is no evidence that defendant did, in fact, refrain from voting on legislation concerning HMOs that came before the Assembly.

38

his position with Neighborhood Marketing and established his own consulting firm. Def. Ex. Y. Seminerio provided no description of the consulting work his firm would be doing, but stated that he had "discussed the matter with Assembly Counsel . . . [and] [i]n his opinion, no conflict was presented." Id. Although the letter requested a formal written opinion, none was ever issued by the Legislative Ethics Committee.

Under New York Legislative Law § 80(7)(n), a legislative ethics opinion can in certain circumstances provide a defense in a criminal proceeding:

> A formal opinion rendered by the [Legislative Ethics] commission, until and unless amended or revoked, shall be binding on the commission in any subsequent proceeding concerning the person who requested the opinion and who acted in good faith, <u>unless material facts were omitted or misstated by the person in the request for an opinion.</u> Such opinion may also be relied upon by such person, and may be introduced and shall be a defense in any criminal or civil action . . .

Id. (emphasis added). However, Seminerio's effort to rely on the 1996 Advisory Opinion is unavailing for two main reasons. First, as indicated above, Seminerio's omission of material facts in requesting that opinion compromises both its integrity and its corresponding force as a legal defense. In other words, and as we noted at the Hearing, the opinion process provides a classic illustration of "garbage in, garbage out." Hr'g Tr. 379. Seminerio prevented the Legislative Ethics Committee from

39

reaching a fully informed decision on the propriety of Seminerio's arrangement with a Medicaid-funded entity and provided no further disclosure about the nature of his consulting work or the other clients of his new business, either in 2001 or at any time thereafter.[22]

Second, while Seminerio argues that he relied on the ethics opinion in good faith, the preponderance of credible evidence simply does not support such a charitable characterization of defendant's state of mind. Having pleaded guilty to a fraudulent scheme to deprive the public of honest services, and having been confronted with credible evidence -- including in particular his own recorded statements -- that the scheme involved his corrupt relationships with paying clients with respect to various State and non-State matters, Seminerio chose not to testify at the Fatico hearing or to offer any alternative explanation for his conduct, much of which demonstrably breached the terms of the very ethics opinion on which he now purports to rely. In this context, Seminerio's mere dependence on the

---

[22] We recognize that establishing Marc Consultants -- a sole proprietorship of which Seminerio was the only employee -- essentially shielded Seminerio from having to identify his clients on his annual disclosures of outside income. State legislators must report annually the "nature and amount of any income in excess of $1000," including "consultant fees," but may report income earned from a business "by the name of the entity and not by the name of the individual customers, clients or tenants . . . " N.Y. Pub. Officers L. §§ 73-a(2)(a) and (3). Thus, creating Marc Consultants allowed Seminerio to list only that business on his annual disclosure, without having to reveal the names of his consulting clients and the particular fees they paid.

40

assertions and arguments of his counsel to establish his good faith reliance proves wholly unpersuasive.

Advisory Opinion 96-06 contemplates that Seminerio "does not participate in any way with applications for state grants or other activities involving New York State." Def. Ex. L. The opinion concludes, inter alia, that the Assemblyman should "abstain from participating in legislative matters which specially benefit clients of the firm he serves" and "refrain from identifying his position with the legislature while working as a marketing representative of the firm." Id. However, as discussed in the findings of fact above, Seminerio did participate in "activities involving New York State" on behalf of his paying clients -- and threatened to use his influence against those who refused to pay him. Such conduct was plainly inconsistent with the ethics opinion.

Furthermore, Seminerio repeatedly violated the opinion's prohibition against "identifying his position with the legislature" while working as a consultant. On the contrary, Seminerio emphasized his position. For example, when speaking with hospital executives on behalf of Winston Financial or General Bernard Gordon Ehrlich, defendant repeatedly introduced himself as "Assemblyman Seminerio." Gov. Exs. 23, 54; see Part II.d.i, supra. Seminerio not only used his official title in his purportedly private "consulting" role, but also encouraged

41

his clients and business associates to make use of his title as well. See, e.g., Gov. Ex. 24 (telling Ehrlich to explain to Wyckoff Heights hospital executives that "the Assemblyman . . . made a commitment to Wyckoff").

For the foregoing reasons, Seminerio's argument that he relied on the 1996 ethics opinion -- and should be entitled to that defense with respect to his non-State consulting services -- is unpersuasive. What is more, defendant's reliance argument becomes somewhat academic in light of the evidence and applicable guidelines provisions in this case. Even if we assume, arguendo, that defendant *is* entitled to the benefit of the ethics opinion -- and further omit from our loss calculation those amounts that could reasonably be attributed to his arguably permissible consulting services related to federal, city, or local agencies,[23] the applicable guidelines range would not change. Following our factual findings discussed above, the total loss calculation under Sections 2C1.1(b)(2) and 2B1.1(b)(1) of the sentencing guidelines would potentially include:

- $310,000 relating to Jamaica Hospital;
- $80,834 relating to Neighborhood Health Providers;

---

[23] While we assume for purposes of this discussion that Seminerio is entitled to the benefit of his reliance on the ethics opinion to the extent that he provided consulting services on non-state matters, we do not address the purported legality of an arrangement that would allow a state legislator to be paid for federal, local, or city lobbying while at the same time utilizing his official title and without disclosing the consulting arrangement.

- $21,000 relating to the Jamaica Chamber of Commerce;

- $706,048 relating to Winston Financial;

- $170,350 relating to Plaza College;

- $250,000 relating to the Long Island Rail Road; and

- $25,000 relating to the undercover FBI agent.

These items would result in a total loss amount of $1,563,232. To give Seminerio the benefit of his argument, we would subtract any fees that Seminerio may have been paid in return for what he argues was permissible consulting regarding federal, city, or local matters.

While the record contains credible evidence of Seminerio's consulting on city matters for two of these entities, namely, Jamaica Hospital and Plaza College, see Gov. Exs. 52, 56; Def's Mem. 219-22, defendant has not adduced evidence of arguably permissible consulting on federal, local, or city matters for any of the other entities. Thus, even excluding the monies Seminerio received from Jamaica Hospital and Plaza College in their entirety -- a generous and plainly over-inclusive subtraction that should not be construed in any way to condone Seminerio's otherwise corrupt relationships with these entities -- the loss amount of $1,563,232 is only reduced to $1,082,882. Because even this more conservative estimate still exceeds $1,000,000, the resulting enhancement to defendant's guidelines

43

range, according to the table of loss amounts provided by U.S.S.G. § 2B1.1(b)(1), is the same.

## CONCLUSION

Anthony Seminerio breached the public trust not only by failing to disclose his conflict of interest, but also by receiving payments for certain actions that plainly would be expected of a reasonably diligent legislator. What is more, Seminerio received payments for actions that would not be expected of a diligent public servant, such as collecting debts, using official clout to maintain contracts that were lucrative to the Assemblyman, and even trading state funding for jobs. Accordingly, defendant's advisory guidelines range is calculated as follows:

The Base Offense Level is 14, pursuant to § 2C1.1(a)(1), because defendant was a public official at the time of the offense. Two levels are added, pursuant to § 2C1.1(b)(1), as the offense involved more than one bribe or extortion. For the reasons stated above, the aggregate total loss amount attributable to defendant's criminal conduct is in excess of $1,000,000 (but less than $2,500,000), resulting in an increase of 16 levels, pursuant to §§ 2C1.1(b)(2) and 2B1.1(b)(1)(I). Four more levels are added, pursuant to § 2C1.1(b)(3), because defendant was an elected public official. The Adjusted Offense Level is therefore 36. The offense is

44

reduced three levels, pursuant to § 3E1.1(a) and (b), because defendant has shown recognition of responsibility for the offense by pleading guilty. This results in a Total Offense Level of 33. In light of this Total Offense Level and defendant's Criminal History Category of I, the applicable advisory guidelines range, before any departures potentially to be determined at sentencing, is 135 to 168 months.

The sentencing of Mr. Seminerio will be held in Courtroom 21A on February 4, 2010, at 11.00 AM.


Dated:     New York, New York
           January 14, 2010

                                    NAOMI REICE BUCHWALD
                                    UNITED STATES DISTRICT JUDGE

Copies of the foregoing Memorandum have been mailed on this date to the following:

Pery D. Krinsky, Esq.
Michael S. Ross, Esq.
Law Offices of Michael S. Ross
60 East 42nd Street, 47th Floor
New York, NY 10165

William J. Harrington, Esq.
U.S. Attorney's Office
Southern District of New York
1 Saint Andrew's Plaza
New York, NY 10007